UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Moody's Investors Service, Inc., Moody's Analytics, Inc., and MIS Quality Management Corp.,<br>Plaintiffs,<br>-against-<br>Stamdata AS,<br>Defendant. | 25-CV-03172 (LAP)<br><br>OPINION AND ORDER |

LORETTA A. PRESKA, Senior United States District Judge:

Before the Court is Defendant Stamdata AS's Motion to Dismiss the Complaint (1) for lack of personal jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(2), or, in the alternative, on the ground of forum non conveniens, and (2) for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. 23.) For the following reasons, the Motion is GRANTED IN PART and DENIED IN PART.

## I. FACTUAL BACKGROUND

Plaintiffs Moody's Investors Service, Inc., Moody's Analytics, Inc., and MIS Quality Management Corp. ("Moody's" or "Plaintiffs") are Delaware corporations headquartered in New York, (Compl. ¶¶ 2-4), engaged in the provision of credit ratings,

research, and risk analysis, (id.).[1] As part of this business, Moody's publishes credit ratings on a wide range of debt obligations, financial institutions, and securities around the world. (Id. ¶ 1.) Moody's has registered copyrights in its four databases (CDR, CCDR, Ratings, and SIP) (collectively, "the Database"), each of which contains compilations of financial data. (Id. Exs. A-D.)

Defendant Stamdata AS (hereafter "Stamdata" or "Defendant") is a Norwegian corporation with its place of business in Oslo, Norway. (Compl. ¶ 4.) Stamdata's principal business is providing information on the market for fixed income assets in the Nordic countries. (Nervik Decl. ¶¶ 2 n.1, 3.)[2] In 2024, Stamdata had two subscribers in New York out of its 1,307 total subscribers, neither of whom had access to credit ratings from Stamdata. (Id. ¶ 15.) Subscription revenues from the United States represented

---

[1] The following factual background is drawn from the Plaintiffs' complaint, (Dkt. 1) ("the Complaint" or "Compl."), Aleksander Gerecke Nervik's Declaration in Support of Defendant's Motion to Dismiss, (Dkt. 24) ("Nervik Decl."), and Camilla Vislie's Declaration of Foreign Law in Support of Defendant's Motion to Dismiss for Lack of Personal Jurisdiction, (Dkt. 26) ("Vislie Decl."). The other documents and memoranda discussed in this opinion are as follows: Defendant's Memorandum of Law in Support (Dkt. 27) ("Supp. Mem."); Defendant's Reply Memorandum of Law in Support (Dkt. 34) ("Rep. Mem."); Plaintiffs' Memorandum of Law in Opposition (Dkt. 30) ("Opp. Mem."); and Knut Glad and Beatrice Ignacius's Declaration (Dkt. 31) ("Glad Decl.").

[2] The Court considers only those allegations within the four corners of the Complaint when assessing Defendant's Motion to Dismiss for failure to state a claim under Rule 12(b)(6). When evaluating a motion to dismiss for lack of personal jurisdiction, however, the Court may consider materials outside the pleadings. American Girl, LLC v. Zembrka, 118 F.4th 271, 276 (2d Cir. 2024) (quoting MacDermid, Inc. v. Deiter, 702 F.3d 725, 727 (2d Cir. 2012)). The Court thus considers Stamdata's declarations only for the purposes of assessing personal jurisdiction.

approximately 2.5 percent of Stamdata's revenue in 2025. (Id. ¶ 21.)

Stamdata provides its subscribers with a "core data product" containing bond reference data without credit ratings from rating agencies. (See generally Nervik Decl.) However, Stamdata also provides a "Premium Data" product containing credit ratings from various rating agencies (including Moody's) available to a subset of its subscribers. (Id. ¶¶ 10-11.) Stamdata asserts that these ratings are sourced either from publications issued by the rated entity or from bond documentation. (Id. ¶ 13.) While the full Premium Data dataset is only accessed through "machine-to-machine" channels, (id. ¶ 11), Stamdata acknowledges that some Premium Data datapoints are accessible through Stamdata's website for paying Premium Data subscribers. (Id. ¶ 12.)

Stamdata claims that Premium Data is only available to subscribers based in the Nordics, (Nervik Decl. ¶ 11), and has never been offered to non-Nordic clients, (id.). Plaintiffs, however, suspected otherwise. To that end, on October 4, 2024, a New York-based investigative firm retained by Plaintiffs—Norman Carver, Inc. ("Carver")—signed up for a subscription with Stamdata to access information concerning Nordic fixed income securities. (Compl. ¶ 19.) Using the subscription, Carver accessed data concerning a bond, which matured in 2021, issued by JPMorgan Chase & Co., a U.S.-based issuer, but denominated in Norwegian kroner

and sold only outside the United States. (Compl. Ex. E.) The Stamdata listing for the bond, at least as it appeared to Carver, contained a rating that was attributed to "Moody [sic]." (Id.) The parties do not contest that this rating is Moody's.[3]

The gravamen of the Complaint is thus that, both for this U.S.-based subscriber and others around the world, Stamdata is illegally misappropriating Moody's protected ratings and trademark to generate revenue from Stamdata subscribers, all while refusing to pay Moody's for a license to use Moody's intellectual property.

For example, in the course of its investigation, Carver identified one example of a bond for which Stamdata allegedly provides its subscribers with a Moody's protected rating and attributes that (misspelled) rating to Moody's:




[3] Stamdata claims that Carver's access to the rating was the result of a mistake by a newly hired employee who granted Carver access to Stamdata without completing location verification (Nervik Decl. ¶ 31-35); had the employee performed location verification and ascertained Carver's location, Stamdata says Carver would not have had access to the Premium Data product with Moody's ratings because of Stamdata's policy that only Nordic clients may access rating information in the Premium Data product. (Id.)

(Compl. Ex. E.)

Stamdata asserts that when Carver signed up to access Stamdata, Carver clicked to accept an End User License Agreement (the "EULA") which provided, in relevant part: "These User Terms shall be exclusively governed by Norwegian laws. All disputes arising out of, or in connection with this EULA shall be exclusively resolved by the courts of Norway, with the District Court of Oslo as first legal venue." (Vislie Decl. ¶ 8.)

## II. PERSONAL JURISDICTION

### A. Legal Standard

"[T]o survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists." Thomas v. Ashcroft, 470 F.3d 491, 495 (2d Cir. 2006). When deciding a motion to dismiss for lack of personal jurisdiction, the Court "may consider materials outside the pleadings, including 'affidavits and other written materials.'" American Girl, LLC v. Zembrka, 118 F.4th 271, 276 (2d Cir. 2024) (quoting MacDermid, Inc. v. Deiter, 702 F.3d 725, 727 (2d Cir. 2012)). In assessing the plaintiff's prima facie case for personal jurisdiction, the Court construes all pleadings and other supporting materials in the light most favorable to the plaintiffs. Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 732 F.3d 161, 167 (2d Cir. 2013) (citation omitted).

Under N.Y. C.P.L.R. § 302(a)(1), a court may exercise personal jurisdiction over a non-domiciliary who transacts any business within the state or contracts anywhere to supply goods or services in the state. N.Y. C.P.L.R. § 302(a)(1). Even a single transaction with an in-state party may give rise to personal jurisdiction if the defendant's activities "were purposeful and there is a substantial relationship between the transaction and the claim asserted." Kreutter v. McFadden Oil Corp., 71 N.Y.2d 460, 467 (1988). Section 302(a)(1) has two prongs: (1) the defendant must have conducted sufficient activities to have transacted business in New York, and (2) the plaintiff's claims must arise from those transactions. Al Rushaid v. Pictet & Cie, 28 N.Y.3d 316, 323 (2016). Transacting business "means 'purposeful activity—some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" Spetner v. Palestine Inv. Bank, 70 F.4th 632, 639 (2d Cir. 2023) (quoting Best Van Lines, Inc. v. Walker, 490 F.3d 239, 246 (2d Cir. 2007)).

Determining whether a defendant's contacts constitute "transacting business" under Section 302(a)(1) requires looking to the totality of the defendant's contacts with New York. Chloe v. Queen Bee of Beverly Hills, LLC, 616 F.3d 158, 164 (2d Cir. 2010). It is the quality of the contacts, not the quantity, that matters

for this analysis. Paterno v. Laser Spine Inst., 24 N.Y.3d 370, 378 (2014).

The jurisdictional analysis becomes more opaque, however, when a plaintiff herself initiates some or all of the contacts on which she relies to establish jurisdiction. The emerging consensus in this Circuit appears to be that a plaintiff-initiated purchase, standing alone, cannot provide the basis for jurisdiction. However, plaintiff-initiated contacts can, when paired with other organic jurisdictional contacts, provide a valid basis for personal jurisdiction. As the Court of Appeals explained in American Girl, even a single online transaction initiated by American Girl's counsel with shipment to a New York address (even if refunded) "constitute[d] transacting business within New York for purposes of jurisdiction under § 302(a)(1)." 118 F.4th at 277. Together with a "highly interactive" website operated by the defendant which "contribute[d] to [the defendant's] purposeful availment of New York," the Court of Appeals concluded "that [the defendant] 'conducted sufficient activities to have transacted business in [New York].'" Id. at 278 (quoting Al Rushaid, 28 N.Y.3d at 323); see also Chloe, 616 F.3d at 170–71 (holding that defendant's shipping of a single allegedly infringing item to plaintiff counsel's administrative assistant, together with defendant's "highly interactive website offering [infringing items] for sale to New York consumers" and fifty-two other non-

infringing transactions with New York customers, showed "purposeful availment of the benefits of transacting business in New York" for Section 302(a)(1) purposes).

In other words, jurisdiction over a foreign defendant is proper under Section 302(a)(1) when the defendant (1) transacts as to allegedly infringing material with an agent of the plaintiff in the forum state,[4] (2) maintains a highly interactive website[5] through which New York residents may transact business with the defendant, and (3) engages in business transactions[6] in New York other than those with the plaintiff, whether infringing or not.

[4] Some federal district courts have held that personal jurisdiction may not arise solely from an act instigated by a plaintiff. See Buccellati Holding Italia SPA v. Laura Buccellati, LLC, 935 F. Supp. 2d 615, 623 (S.D.N.Y. 2013) (providing examples). But see Mattel, Inc. v. Adventure Apparel, No. 00-CV-4085 (RWS), 2001 WL 286728, at *3 (S.D.N.Y. Mar. 22, 2001) ("The fact that the sale was made to an agent of [the plaintiff's] is irrelevant."). However, the cases discussed in Buccellati are readily distinguishable from this case; none included analysis of other contacts the defendant had with the forum state beyond those initiated by the plaintiff.

[5] When analyzing website interactivity in jurisdictional contexts, courts in this circuit apply the sliding scale standard set out in Zippo Mfg. Co. v. Zippo Dot Com, Inc., 952 F. Supp. 1119 (W.D. Pa. 1997). See Best Van Lines, 490 F.3d at 251. Zippo lays down a "spectrum" of interactivity: situations where a defendant clearly does business over the internet are at one end of the spectrum, while situations where a defendant merely posts information on a website which is accessible in the jurisdiction are at the other end. Id. In the middle, websites where a user can exchange information with the site's host are distinguished by determining the site's interactivity and commercial nature. Id. (citing Zippo, 952 F. Supp. at 1124).

[6] Business transactions for purposes of personal jurisdiction under Section 302(a)(1) may be found when "commercial actors and investors [use] electronic . . . means to project themselves into New York." Deutsche Bank Sec., Inc. v. Mont. Bd. of Invs., 7 N.Y.3d 65, 71 (2006).

**B. Discussion**

**1. Stamdata Transacted Business in New York**

The Court finds that Stamdata has transacted business in New York for the purposes of jurisdiction under Section 302(a)(1).

First, Stamdata provided the allegedly infringing material at issue in this action through its website to an agent of the plaintiff residing in New York. Whether Stamdata's internal policies should have prohibited this transaction is not relevant to the jurisdictional inquiry; if Stamdata did not wish to do business in New York, it could have ensured it did not, either by following its own policies or, alternatively, by geoblocking its website from New York. See American Girl, 118 F.4th at 280 n.7 (observing that the defendant did not block New York residents' access to the website at issue, further contributing to jurisdiction).

Second, Stamdata maintained a highly interactive website because it "clearly does business over the Internet." Best Van Lines, 490 F.3d at 251 (quoting Zippo, 952 F. Supp. at 1124). While Stamdata asserts that most of its customers sign up for subscriptions by email or face-to-face meetings, (Nervik Decl. ¶ 16), Carver signed up for a subscription with Stamdata through Stamdata's website and accessed a Moody's rating through the website. (Compl. Ex. E.) Indeed, Stamdata claims that it uses its website for business purposes by making ratings information

available for clients' verification needs. (Nervik Decl. ¶ 12.) Because Stamdata used its site both to solicit subscribers worldwide (including in New York[7]) and to provide a service to paying customers, the website is highly interactive and contributes to the business transaction analysis under Section 302(a)(1).

Third, Stamdata concededly conducts business with two other New York residents not affiliated with Moody's. While these contacts are certainly fewer in number than the additional purchases in Chloe, 616 F.3d at 170-71, it is the quality—not quantity—of contacts with New York-based subscribers that matters for this analysis. See Paterno, 24 N.Y.3d at 378. Stamdata evidently maintained the two New York-based non-Carver subscribers for a significant period of time. (See Nervik Decl. ¶ 15 (explaining that the two New York residents were currently subscribed at the time of the declaration in 2025 and had been subscribed in 2024 as well).) Accordingly, these subscriptions provide sufficient contacts such that Stamdata purposefully

[7] That Stamdata claims it was not aware of Carver's presence in New York is inapposite. Section 302(a)(1) asks whether the defendant in fact transacted business in New York, not whether it subjectively intended to do so. And again, Stamdata could have avoided the New York transaction altogether, either by following its own onboarding procedures—which were supposed to collect every subscriber's location information—or by geoblocking its website. See American Girl, 118 F.4th at 280 n.7. That a Stamdata employee erred in misapplying company policy does not defeat Stamdata's trio of contacts with New York.

availed itself of the privilege of doing business in New York and thus could reasonably have expected to be haled into court there. See Spetner, 70 F.4th at 639.

### 2. Moody's Claims Arose from Stamdata's Transactions in New York

Having concluded that Stamdata transacted business in New York, the Court turns to the second prong of the Section 302(a)(1) jurisdictional inquiry: whether the claims arise out of Stamdata's New York transactions. On this second prong, the Court undertakes a "relatively permissive" inquiry, requiring only "a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former, regardless of the ultimate merits of the claim." Licci v. Lebanese Canadian Bank, 20 N.Y.3d 327, 339 (2012). Only when a plaintiff's claims are "too attenuated" from or "merely coincidental" to the transactions will this prong fail. Id.

Here, Moody's claims plainly arise out of Stamdata's New York-based transactions because they each rest on the very Premium Data product that Stamdata allegedly provided to Carver in New York. Accordingly, the second prong of Section 302(a)(1) is satisfied. Because jurisdiction is proper under Section 302(a)(1), the Court need not reach Moody's alternative arguments under Section 302(a)(3)(ii) and Federal Rule of Civil Procedure 4(k)(2).

### 3. Due Process

As New York's long-arm statute applies to Stamdata in this matter, the Court next determines whether exercising personal jurisdiction over Stamdata comports with constitutional due process protections. See American Girl, 118 F.4th at 279 (citing Eades v. Kennedy, PC L. Offs., 799 F.3d 161, 168 (2d Cir. 2015)). The due process analysis proceeds in two steps. First, the Court evaluates the quality of the defendant's contacts with the state under a totality of the circumstances test to determine whether the defendant has had minimum contacts with the state such that the defendant purposefully availed itself of the privilege of doing business in the state and could foresee being haled into court there. See Licci, 732 F.3d at 170 (citing Best Van Lines, 490 F.3d at 242). Second, the Court determines whether exercising jurisdiction comports with fair play and substantial justice. Licci, 732 F.3d at 170. On this second prong, the Court weighs five factors: (1) the burden imposed on the defendant by exercising jurisdiction; (2) the forum state's interests in adjudicating the case; (3) the plaintiff's interest in convenient and effective relief; (4) the judicial system's interest in efficient resolution of the controversy; and (5) the states' shared interest in furthering substantive social policies. Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 568 (2d Cir. 1996) (citing Asahi Metal Indus. Co. v. Superior Ct. of Cal., Solano Cnty., 480 U.S.

102 (1987)). "Where a plaintiff makes the threshold showing of the minimum contacts required for the first test, a defendant must present 'a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 305 F.3d 120, 129 (2d Cir. 2002) (quoting Metro. Life Ins. Co., 84 F.3d at 568). "The import of the 'reasonableness' inquiry varies inversely with the strength of the 'minimum contacts' showing—a strong (or weak) showing by the plaintiff on 'minimum contacts' reduces (or increases) the weight given to 'reasonableness.'" Id. (citation omitted).

Because Stamdata satisfied the requirements for personal jurisdiction under Section 302(a)(1), it also has the minimum contacts constitutional due process requires. See American Girl, 118 F.4th at 279 (citing Chloe, 616 F.3d at 171). Considering the minimum contacts Moody's pleads, jurisdiction over Stamdata is reasonable. The first factor favors Plaintiffs; while the Court recognizes litigating in New York poses some additional burden on Stamdata, the same inconveniences would burden Moody's if this case were litigated in Norway. See Chloe, 616 F.3d at 173 (discussing how the inconvenience of travel for purposes of jurisdictional reasonableness "cuts both ways"). The second factor also favors exercising jurisdiction over Stamdata: regardless of whether any other forum might possibly provide

Moody's with relief, New York "frequently has a 'manifest interest in providing effective means of redress for its residents.'" Id. (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 483 (1985)). As Plaintiffs are headquartered in New York, the third factor clearly favors them. The final two factors are neutral here. Because New York's interest in providing its residents (including Moody's) with convenient and effective relief outweighs the inconvenience of requiring a foreign defendant to litigate in New York, see American Girl, 118 F.4th at 280, personal jurisdiction over Stamdata comports with due process.

## III. FORUM NON CONVENIENS

Stamdata advances two alternative arguments for why dismissal is proper for forum non conveniens: (1) a conventional forum non conveniens analysis, and (2) an argument that the EULA purportedly agreed to by Carver while accessing Stamdata's subscription requires litigation in Norway. For the reasons discussed below, both arguments fail.

### A. Legal Standard

A forum non conveniens analysis proceeds in three steps. See Gross v. Brit. Broad. Corp., 386 F.3d 224, 230 (2d Cir. 2004). First, the Court determines the degree of deference to be given to the plaintiff's choice of forum. Id. While a plaintiff may not harass or oppress a defendant by selecting a vexatious forum, the Court of Appeals has explained that "our legal system has

traditionally deferred to the plaintiff's choice of forum, and 'unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed.'" Id. (quoting Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508 (1947)). The plaintiff's choice of forum thus stands unless the defendant satisfies its burden of demonstrating otherwise. Iragorri v. United Techs. Corp., 274 F.3d 65, 71 (2d Cir. 2001) (en banc). Second, "the court must consider whether an adequate alternative forum exists." Id. at 73. If one does, the Court proceeds to the third step: balancing several private and public interest factors to determine the comparative inconvenience of litigating in the plaintiff's chosen forum as opposed to the alternative forum. Id. The relevant private interest factors are: (1) the relative ease of accessing evidence; (2) the ability to compel testimony by compulsory process and the costs of witness availability; (3) the ability to view the relevant premises, if appropriate; and (4) other practical problems associated with trial. Piper Aircraft Co. v. Reyno, 454 U.S. 235, 241 n.6 (1981) (cleaned up). The public interest factors are: (1) the administrative difficulties of court congestion; (2) the "local interest in having localized controversies decided at home;" (3) the interest in having the trial in a forum at home with the law that governs the action; (4) avoiding unnecessary conflicts of law or applying foreign law; and (5) the unfairness of burdening citizens in the forum with jury

duty. Id. In balancing these factors, the Court considers the issues likely to be tried and the accompanying practical considerations concerning witnesses and the availability of evidence. See Iragorri, 274 F.3d at 74.

**B. Dismissal for Forum Non Conveniens Is Unwarranted**

Stamdata has not met its significant burden of demonstrating that dismissal for forum non conveniens is warranted.

Moody's choice of forum is entitled to a great deal of deference—Moody's is headquartered in New York and thus is suing in its home forum. See Iragorri, 274 F.3d at 71 (citing Koster v. (Am.) Lumbermens Mut. Cas. Co., 330 U.S. 518, 524 (1947)). Further, there is no indication in the record that Moody's chose this forum to harass Stamdata.

Norway provides a possible alternative forum. While Norway likely would not allow for vindication of all of Moody's claims arising under New York state law, the Court takes Stamdata's point that Norway nevertheless respects and enforces U.S. copyrights. (See Supp. Mem. at 23.) While Norway may not be an ideal forum for Moody's, it is an adequate one. The Court thus proceeds to analyzing the appropriate private and public interest factors.

The private interest factors somewhat favor litigating in Norway—many of the relevant documents (or computer servers, as the case may be) and witnesses are in Norway, except perhaps for Carver. However, as the Court has noted before, concerns

surrounding the availability of documents and witnesses have ameliorated in our modern digital age. See Petersen Energia Inversora S.A.U. v. Argentine Republic, No. 15-CV-2739 (LAP), 2020 WL 3034824, at *11 (S.D.N.Y. June 5, 2020). Thus, the private factors' weight in favor of litigating in Norway, while real, is slight.

On the other hand, the public interest favors litigating this case in New York. In particular, New York has a strong interest in providing its domiciled corporations, like Moody's, with an effective venue to vindicate their intellectual property rights, especially when allegedly infringing products are sold to New York and other U.S.-based residents. And while Stamdata argues that Norwegian law may govern some of the issues at play, the core of Moody's theory of liability turns on domestic applications of both the Copyright Act and the Lanham Act. Accordingly, the public interest favors litigation in New York.

The Court thus finds that Stamdata has failed to overcome the deference afforded to Moody's choice of forum.

### C. The End User License Agreement Does Not Apply to This Suit

Alternatively, Stamdata suggests that the EULA purportedly accepted by Carver (acting at Plaintiffs' behest) compels litigating this matter in Norway. But even assuming Carver agreed

to the EULA, the EULA's forum selection clause does not demand dismissal because it does not apply to the claims in this suit.

"[T]o obtain dismissal based on a forum selection clause the party seeking enforcement of the clause must demonstrate that: (1) the clause was reasonably communicated to the party resisting enforcement; (2) the clause was mandatory and not merely permissive; and (3) the claims and parties involved in the suit are subject to the forum selection clause." Altvater Gessler-J.A. Baczewski Int'l (USA) Inc. v. Sobieski Destylarnia S.A., 572 F.3d 86, 89 (2d Cir. 2009) (citing Phillips v. Audio Active Ltd., 494 F.3d 378, 383-84 (2d Cir. 2007)).

Even assuming, without deciding, that Stamdata satisfies the first two elements required for forum non conveniens dismissal, dismissal under the EULA is not appropriate because Moody's claims are not subject to the forum selection clause. As the EULA is governed by Norwegian law, the matter of its interpretation is a question of foreign law for which the Court may consult any source in resolving. FED. R. CIV. P. 44.1. Accordingly, both parties submitted declarations from Norwegian counsel concerning the interpretation of the relevant provision of the EULA. (See Vislie Decl.; Glad Decl.) While the parties' declarations unsurprisingly reached opposite conclusions regarding the forum selection clause, both sides' declarations agreed that whether the forum selection clause applies hinges on whether Plaintiffs' claims here are

"dispute[s] arising out of, or in connection with [the] EULA." (Vislie Decl. ¶¶ 8, 23–24 (providing the EULA's wording and arguing that Moody's claims arise out of or relate to the EULA); Glad Decl. ¶ 18 (asserting that a Norwegian court "would likely conclude that Moody's claims lack the sufficient connection or nexus to the EULA" for the forum selection clause to apply).) Stamdata's Norwegian counsel highlights that the Norwegian Supreme Court has held that "whether the claim brought is covered by the [agreed upon] clause must depend on an assessment of the connection between the claim and the contract entered into." (Vislie Decl. ¶ 24.) And Moody's Norwegian counsel points out that the clause regulates subscribers' use of Stamdata's service, not Stamdata's use of others' materials. (Glad Decl. ¶ 15.)

While Carver accessed Stamdata's service as part of Moody's investigation, and Stamdata's display of ratings and the "Moody's" trademark to Carver satisfied some of the requirements for personal jurisdiction over Stamdata, the terms of the EULA do not govern Stamdata's use of a third party's intellectual property. The Court therefore credits the Declaration of Knut Glad and Beatrice Ignacius and, based on the clause's language, finds that Moody's claims are not subject to the forum selection clause.

Because the EULA's forum selection clause does not apply to the claims at issue here, the EULA does not require dismissal.

Accordingly, the Court may and does exercise jurisdiction over this matter.

## IV. FAILURE TO STATE A CLAIM

Having determined that personal jurisdiction over Stamdata is proper, the Court turns next to whether any of Moody's claims against Stamdata survive the motion to dismiss for failure to state a claim. FED. R. CIV. P. 12(b)(6).

### A. Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the facts alleged allow the Court to draw the "reasonable inference that the defendant is liable for the misconduct alleged." Id. Plausibility does not require probability, but "asks for more than a sheer possibility." Id. In assessing a complaint, the Court must construe it liberally, accepting all facts alleged as true, and draw all reasonable inferences in the plaintiffs' favor. Sacerdote v. N.Y. Univ., 9 F.4th 95, 106-07 (2d Cir. 2021). However, the Court disregards all conclusory allegations in the Complaint, including a "formulaic recitation of the elements of a cause of action." Twombly, 550 U.S. at 555.

"A plaintiff may satisfy the plausibility standard by pleading facts upon information and belief." Evergreen E. Coop. v. Whole Foods Mkt., Inc., No. 21-2827-CV, 2023 WL 545075, at *2 (2d Cir. Jan. 27, 2023). However, the words "upon information and belief" do not magically render a conclusory allegation non-conclusory. Citizens United v. Schneiderman, 882 F.3d 374, 384 (2d Cir. 2018). Instead, "[t]hose magic words will only make otherwise unsupported claims plausible when 'the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible.'" Id. at 384–85 (quoting Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010) (citations omitted)).

**B. Copyright Infringement**

Moody's alleges that Stamdata infringed Moody's copyright in its Database as a compilation. Although the Court agrees that Moody's may well have a viable copyright infringement claim against Stamdata (whether as to individual Moody's ratings or as a compilation), Moody's threadbare Complaint fails entirely to supply the specific allegations necessary to plead either theory of infringement. Accordingly, the Court dismisses Moody's copyright claim without prejudice and invites Moody's to re-plead the claim in an amended complaint.

**1. Moody's Copyright Claims Are Not Barred by the Presumption Against Extraterritoriality**

As an initial matter, Moody's copyright infringement claims are not barred by the presumption against extraterritoriality.

The Copyright Act, like all federal statutes, is subject to the presumption against extraterritoriality. See Update Art, Inc. v. Modiin Pub., Ltd., 843 F.2d 67, 73 (2d Cir. 1988) ("It is well established that copyright laws generally do not have extraterritorial application."); Impression Prods., Inc. v. Lexmark Int'l, Inc., 581 U.S. 360, 379 (2017) (noting as dicta that copyright protections do not have any extraterritorial operation). To determine whether the presumption against extraterritoriality applies to given conduct, courts look to where the conduct at issue relevant to the statute's focus occurred. If the relevant conduct occurred in the United States, the case involves a permissible domestic application of the Copyright Act. RJR Nabisco, Inc. v. Eur. Cmty., 579 U.S. 325, 337 (2016). If the relevant conduct occurred abroad, the case involves an impermissible extraterritorial application regardless of other conduct. Id.

While the Court of Appeals has not yet directly addressed the issue of extraterritoriality in the context of the internet publication abroad of allegedly infringing material when that material is accessible in the United States, other courts to

consider the issue have concluded that accessibility in the United States, coupled with "some additional link between the foreign publication on the internet and the United States," constitutes domestic conduct for the purposes of the extraterritoriality analysis. State St. Glob. Advisors Tr. Co. v. Visbal, 431 F. Supp. 3d 322, 340 (S.D.N.Y. 2020); see also Spanski Enters., Inc. v. Telewizja Polska, S.A., 883 F.3d 904, 914–15 (D.C. Cir. 2018) (holding that intentional foreign transmission of infringing content into the United States defeats the presumption against extraterritoriality because, "[g]iven the ease of transnational internet transmissions, a statutory scheme that affords copyright holders no protection from such broadcasters would leave the door open to widespread infringement").

Applying those principles, Moody's has plausibly alleged that the relevant conduct occurred domestically when Stamdata intentionally provided Carver with access to Moody's ratings in New York. (Compl. ¶¶ 19–20.) Carver could not have accessed the allegedly infringing content without Stamdata's affirmative acceptance of Carver's paid subscription. Stamdata's suggestion that Carver "went to Norway to access Stamdata's database" while Stamdata remained a passive actor, (Supp. Mem. at 24), is thus unpersuasive.

Because at least some of Stamdata's allegedly infringing conduct took place in the United States, the presumption against extraterritoriality does not bar Moody's copyright claim.

### 2. Moody's Has Not Plausibly Alleged Copying Under Either Theory of Infringement

However, while the Court agrees that Moody's may well have a viable copyright claim, that claim fails as currently pleaded.

To state a claim for copyright infringement, Plaintiffs must plausibly allege: (1) ownership of a valid copyright, and (2) copying of original elements of the work. Abdin v. CBS Broad. Inc., 971 F.3d 57, 66 (2d Cir. 2020). Through the "compilation" theory of infringement, a publisher may allege that a compilation of information is entitled to protection, even if individual pieces of information contained therein are not. Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 348 (1991). Under the compilation theory, "[t]he copyright in a compilation . . . extends only to the material contributed by the author of such work." 17 U.S.C. § 103(b). For compilations, that newly contributed material includes "the selection, coordination, and arrangement of facts" but does not extend to the underlying facts and data the copyright holder has collected. Feist, 499 U.S. at 359. Alternatively, a publisher such as Moody's may sometimes claim that individual estimates or valuations—such as Moody's credit ratings—are themselves entitled to copyright protection.

See CCC Info. Servs., Inc. v. Maclean Hunter Mkt. Reps., Inc., 44 F.3d 61, 67 (2d Cir. 1994).

While the threadbare Complaint is entirely silent on this distinction, Moody's briefing alludes to both theories of infringement. Moody's primarily argues that Stamdata's copying of ratings from the Database is a form of compilation-based infringement, given that the Database represents a particular selection, coordination, or arrangement of ratings (regardless of whether the individual ratings are themselves protected). Alternatively, Moody's suggests that its ratings are individually entitled to copyright protection.[8] On that theory, Moody's would

---

[8] As to the individual-ratings theory, Moody's alleges that it "owns all proprietary rights to certain ratings," (Compl. ¶ 10), and Moody's briefing argues (albeit in a footnote) that Moody's ratings "are not facts and surely fall within the ambit of copyright protection." (Opp. Mem. at 29 n.15.) To be sure, there is at least some precedent suggesting that Moody's ratings may well be protected by copyright at the individual level. See Maclean Hunter, 44 F.3d at 67 (holding that a plaintiff's estimated valuations for used cars were copyrightable both as a compilation and individually); Rapaport USA, Inc. v. Nivoda USA LLC, No. 25-1065, --- F.4th ----, 2026 WL 2617435, at *7-8 (2d Cir. Sept. 4, 2026) (holding that the district court erred in concluding, on the limited record before it, that the merger doctrine barred a claim of copyright in individual diamond price estimates, while expressly declining to reach whether such individual prices are copyrightable or whether registration of a collective work reaches them). And while Stamdata argues that Moody's has failed to register its individual ratings, it is not necessarily apparent to the Court that Moody's must register each individual rating that it seeks to protect so long as it has registered collective sets of ratings. See, e.g., Morris v. Bus. Concepts, Inc., 259 F.3d 65, 68 (2d Cir. 2001) ("[W]here the owner of a copyright for a collective work also owns the copyright for a constituent part of that work, registration of the collective work is sufficient to permit an infringement action under § 411(a) for the constituent part."), abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick, 559 U.S. 154 (2010); Grant v. Trump, 749 F. Supp. 3d 423, 431 (S.D.N.Y. 2024) (same). To rely on the collective works doctrine, however, Moody's would need to allege that (i) Moody's copyright registrations are in fact registrations of collective works rather than claims limited to compilation authorship, and (ii) Moody's owns copyright in the individual ratings themselves. As noted below, the current Complaint pleads neither.

need to allege that Stamdata copied those protected ratings by selling access to them through its own database.

In any event, the Court need not reach at this stage whether Moody's can assert an individual-rating or compilation-based theory of infringement (or both). For present purposes, the Complaint is so threadbare and conclusory that the Court cannot discern what particular theory of infringement Moody's is alleging. The Complaint merely alleges that "Stamdata has copied, distributed, and used substantial portions of the Moody's Database without authorization." (Compl. ¶ 18.) Although, as the Court has noted, the individual Moody's ratings could well be entitled to copyright protection, and registration of those ratings could well be accomplished under the collective works doctrine, Moody's makes no such allegation in the Complaint. And although the Complaint alludes to a compilation-based theory of infringement in suggesting that "[t]he reference data that Stamdata sells to its subscribers includes . . . the selection, coordination, and arrangement of Moody's ratings in the Moody's Database," (Compl. ¶ 22), the Complaint entirely fails to allege what original aspects of the Database's selection, coordination, or arrangement were copied.[9]

---

[9] Moody's claims that, because Stamdata advertises that subscribers can download "complete reference data," including Moody's ratings, Stamdata must also be copying the selection, coordination, and arrangement of the Database because "given the reporting requirements for Solvency II and the volume of covered

Because Moody's fails to allege plausibly that Stamdata copied any protectable ratings (or alternatively elements of the Database as a compilation), the Court dismisses Moody's copyright infringement claims without prejudice.

### C. Breach of Contract

Moody's claim for breach of contract fails because it does not identify a specific contract Stamdata breached.

To state a claim for breach of contract under New York law, Moody's must allege plausibly the existence of an agreement. Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996). The Complaint alleges that "the terms and conditions applicable to Moody's ratings obtained from any publicly available website prohibit scraping of Moody's ratings, deep linking to those ratings, access by any automated program, expert system or 'bot,' and the commercial redistribution of Moody's ratings." (Compl. ¶ 38.) Thus, Moody's argument goes, Stamdata must have breached some contract Moody's is entitled to benefit from as a third party in order to collect Moody's ratings. (See Opp. Mem. at 33.) The

assets, it is implausible that Stamdata populates the automated data inputs advertised to its subscribers by manually collecting thousands of pieces of data from one-off sources." (Opp. Mem. at 31.) While Moody's speculation in its briefing may well have merit, Moody's will need to allege additional facts to support that theory in its amended complaint. Moreover, to the extent that Moody's suggests that Stamdata has only copied individual ratings (rather than the Database as a whole), Moody's may need to allege that the individual ratings are protected to survive a renewed motion to dismiss.

Court is unconvinced. Even accepting Moody's allegation that the terms and conditions of all publicly available websites prohibit the commercial redistribution of Moody's ratings, this is a fact "merely consistent with" the existence of an agreement, not a fact "plausibly suggesting" one. Twombly, 550 U.S. at 557. Moody's admits it cannot definitively identify where Stamdata obtained Moody's ratings, let alone an agreement governing access to that hypothetical source. (Opp. Mem. at 33.) That Stamdata has not disclosed specifically where it sources ratings is inapposite—the burden is on Moody's as plaintiff to plead sufficient facts to make out each element of its claims. Moody's breach of contract claim therefore fails as currently pleaded.

**D. Trademark Infringement and Unfair Competition**

Moody's alleges that Stamdata has infringed the "Moody's" trademark by using the word "Moody" to identify Moody's ratings in Stamdata's data products. (Compl. ¶¶ 47-49; id. Ex. E at 2.) Stamdata counters by arguing that (1) Moody's claim is barred by the presumption against extraterritorial application of United States laws, (2) Moody's fails to allege consumer confusion, and (3) Stamdata's use of the "Moody's" mark was nominative fair use. (Supp. Mem. at 29-33.) Moody's claim is not extraterritorial. And while Moody's trademark infringement claim passes muster, its unfair competition claim does not.

### 1. Moody's Trademark Infringement Claim Is Not Barred by the Presumption Against Extraterritoriality

As a threshold matter, Moody's trademark infringement claim is not barred by the presumption against extraterritoriality.

In Abitron Austria GmbH v. Hetronic Int'l, Inc., 143 S. Ct. 2522 (2023), the Supreme Court held that the Lanham Act is not extraterritorial and thus courts must assess whether trademark claims involve permissible "domestic" applications of the Lanham Act. Id. at 2530. Whether the infringing "use in commerce" occurred domestically or abroad "provides the dividing line" between permissible domestic and impermissible foreign applications of the Lanham Act. Id. at 2534. Under the Lanham Act, "use in commerce" means the bona fide use of the mark "in the ordinary course of trade" to identify and distinguish the mark user's goods and indicate the source of goods. Id. (quoting 15 U.S.C. § 1127).

As previously discussed, Moody's has plausibly alleged that Stamdata provided Carver with access to a Moody's rating labeled with the "Moody's" mark (or "Moody") in New York. (Compl. ¶¶ 19-20.) For the same reasons discussed above in the Court's extraterritoriality analysis with respect to the Copyright Act, Stamdata's alleged conduct did not merely "mak[e] available" the allegedly infringing material online but was instead targeted toward a domestic entity—Carver. Further, the use of the Moody's

mark in the United States was "in commerce" because the mark served to indicate the source of the Moody's ratings provided on Stamdata's website. See Abitron, 143 S. Ct. at 2534. Accordingly, Moody's trademark infringement claim is a permissible domestic application of the Lanham Act and overcomes the presumption against extraterritoriality.

**2. Applicable Law**

The Lanham Act makes it illegal to "use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a). Thus, to state a claim for trademark infringement, Moody's "must show first, that its mark is protected, and second, that the defendant's 'use in commerce' of the allegedly infringing mark would 'likely cause confusion' as to the origin, sponsorship, or affiliation of the defendant's goods with plaintiff's goods." 1-800 Contacts, Inc. v. JAND, Inc., 119 F.4th 234, 246 (2d Cir. 2024) (citations omitted). Registration of a trademark is prima facie evidence that the mark is valid and protected. See Vans, Inc. v. MSCHF Prod. Studio, Inc., 88 F.4th 125, 136 (2d Cir. 2023).

To determine the likelihood of confusion, courts in this circuit apply the eight factors identified in Polaroid Corp. v.

Polarad Electronics Corp., 287 F.2d 492, 495 (2d Cir. 1961). Those factors are:

> (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may "bridge the gap" by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market.

Star Indus., Inc. v. Bacardi & Co., 412 F.3d 373, 384 (2d Cir. 2005). Ultimately, the Polaroid inquiry asks whether consumers are likely to be confused, considering the products in their totality. Id.

Because the Polaroid factors are a "bad fit" where a defendant claims nominative fair use (that is, where a defendant purportedly uses a plaintiff's mark to identify the source of information or a product), the Court of Appeals has held that courts are to consider three additional factors in nominative fair use cases:

> (1) whether the use of the plaintiff's mark is necessary to describe both the plaintiff's product or service and the defendant's product or service, that is, whether the product or service is not readily identifiable without use of the mark; (2) whether the defendant uses only so much of the plaintiff's mark as is necessary to identify the product or service; and (3) whether the defendant did anything that would, in conjunction with the mark, suggest sponsorship or endorsement by the plaintiff holder, that is, whether the defendant's conduct or language reflects the true or accurate relationship between plaintiff's and defendant's products or services.

Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC, 823 F.3d 153, 168 (2d Cir. 2016).

The Court of Appeals has stated that assessing fair use "often requires consideration of facts outside of the complaint and thus is inappropriate to resolve on a motion to dismiss." Kelly-Brown v. Winfrey, 717 F.3d 295, 308 (2d Cir. 2013). Many courts in this circuit therefore "routinely reject[] nominative fair use arguments at the motion to dismiss stage because of its inherently factual inquiry." Int'l Council of Shopping Ctrs., Inc. v. Info Quarter, LLC, No. 17-CV-5526 (AJN), 2018 WL 4284279, at *5 (S.D.N.Y. Sept. 7, 2018) (collecting cases). Courts are similarly hesitant to decide the Polaroid factors inquiry on a motion to dismiss. See Hermes Int'l v. Rothschild, 603 F. Supp. 3d 98, 106 (S.D.N.Y. 2022) ("Applying the Polaroid factors is fact-intensive, and resolving the likelihood of confusion on a motion to dismiss posture is not appropriate."); see also Kelly-Brown, 717 F.3d at 307 (noting that "the Polaroid test . . . is a fact-intensive inquiry that depends greatly on the particulars of each case"). Nominative fair use may only "be adjudicated [on a motion to dismiss] where the facts necessary to establish [it] are evident on the face of the complaint." Kelly-Brown, 717 F.3d at 308.

### 3. Moody's Plausibly Alleges Trademark Infringement

Considering only the facts as alleged in the Complaint, assuming them to be true, and disregarding any conclusory

allegations, Moody's has successfully stated a claim for trademark infringement.

First, Moody's has pled that it has a valid trademark registration for the "Moody's" mark. (Compl. ¶¶ 42-44.) This registration is prima facie evidence of mark protectability. Vans, 88 F.4th at 136.

Turning to the likelihood of confusion, the Court, mindful of the Court of Appeals' admonitions that both the Polaroid and nominative fair use analyses are ill-suited to resolution on a motion to dismiss, concludes that the Complaint contains sufficient allegations to allege plausibly a likelihood of confusion. In particular, the Complaint contains allegations supporting Moody's allegation of a likelihood of confusion with respect to (1) the strength of the "Moody's" mark;[10] (2) the similarity between the "Moody's" mark and Stamdata's allegedly infringing use; and (3) the proximity of the uses in the relevant market.[11] While the Complaint's factual allegations may well be thin, they are sufficient for pleading purposes. See Hermes, 603

---

[10] Moody's alleges that "Moody's has built a substantial reputation in the 'Moody's' name and it is well-known and distinctive around the world" and that "the consuming public and the trade have come to recognize, and do recognize, MOODY'S as being used by Moody's . . . and to associate and identify . . . ratings designated with the mark MOODY'S, as emanating from and authorized by a single source: Moody's." (Compl. at 9-10.)

[11] While Moody's and Stamdata's products do not directly compete at a macro level, both products generally provide customers with access to financial information (including the same Moody's ratings).

F. Supp. 3d at 106 (finding a plaintiff's factual allegations with respect to three of the Polaroid factors "sufficient to survive a motion to dismiss"). And while Stamdata's nominative fair use argument may well have merit, this is not a case akin to Weight Watchers Int'l, Inc. v. Noom, Inc., 403 F. Supp. 3d 361 (S.D.N.Y. 2019), where all three nominative fair use factors weighed decisively in the defendant's favor.[12] Stamdata's observation that the one customer identified in the Complaint was not confused, (Compl. ¶¶ 65–66), does not change the Court's analysis, as the question at this stage is whether general consumer confusion is likely, not whether any specific consumer was in fact confused. Accordingly, the Court declines to dismiss Moody's trademark infringement claim.

### 4. Moody's Unfair Competition Claim Fails

Although Moody's trademark infringement claim survives, its unfair competition claim requires something more, and Moody's comes up short. The elements for federal trademark infringement and unfair competition under New York law largely mirror one another, though a New York unfair competition claim also requires

[12] See Weight Watchers, 403 F. Supp. 3d at 379–80. The most notable difference between this case and Weight Watchers is on the third nominative fair use factor: the suggestion of sponsorship or endorsement. While in Weight Watchers, the advertisement text at issue did "not plausibly 'suggest sponsorship or endorsement'" of the defendant by the plaintiff, id. at 380, here it is much more reasonable for a user of Stamdata's Premium Data product to assume that Stamdata, a commercial financial data provider, had licensed access to Moody's data from Moody's, a different (and arguably competing) financial data provider.

that the defendant acted in bad faith. ESPN, Inc. v. Quiksilver, Inc., 586 F. Supp. 2d 219, 230 (S.D.N.Y. 2008); see C=Holdings B.V. v. Asiarim Corp., 992 F. Supp. 2d 223, 244 (S.D.N.Y. 2013) ("An unfair competition claim under New York common law requires all the elements of a Lanham Act unfair competition claim plus a showing of bad faith.").

Moody's argues that Stamdata's active refusal when asked to pay for a license for the ratings and "Moody's" mark constitutes bad faith. The Court finds that insufficient, standing alone, to allege plausibly that Stamdata acted in bad faith. The Complaint pleads no facts bearing on Stamdata's state of mind beyond the refusal itself, and a refusal to take a license does not plausibly suggest bad faith on its own. Accordingly, the Court dismisses Moody's unfair competition claim with leave to re-plead.

**E. Trademark Dilution**

Moody's separately alleges that Stamdata has diluted the "Moody's" mark by depriving Moody's of quality control over Moody's ratings. For the reasons discussed below, this claim fails.

**1. Applicable Law**

To state a claim for trademark dilution under 15 U.S.C. § 1125(c), a plaintiff must allege that "(1) the mark is famous; (2) [the] defendant's use of the mark is made in commerce; (3) the defendant used the mark after the mark is famous; and (4) the defendant's use of the mark is likely to dilute the quality of the

mark by blurring or tarnishment." DigitAlb, Sh.a v. Setplex, LLC, 284 F. Supp. 3d 547, 557 (S.D.N.Y. 2018) (citing A.V.E.L.A., Inc. v. Est. of Marilyn Monroe, LLC, 131 F. Supp. 3d 196, 211 (S.D.N.Y. 2015)). Both parties appear to frame Moody's tarnishment theory as an issue of "quality control," and the Court adopts that framing for purposes of this motion.

Distribution of a product that does not adhere to the trademark holder's quality control procedures may constitute dilution by tarnishment. Warner-Lambert Co. v. Northside Dev. Corp., 86 F.3d 3, 6 (2d Cir. 1996). In such quality control cases, "the actual quality of the goods is irrelevant; it is the control of quality that a trademark holder is entitled to maintain." El Greco Leather Prods. Co. v. Shoe World, Inc., 806 F.2d 392, 395 (2d Cir. 1986) (emphasis added). For quality control tarnishment, a plaintiff must plead that: "(i) it has established legitimate, substantial, and nonpretextual quality control procedures, (ii) it abides by these procedures, and (iii) the nonconforming sales will diminish the value of the mark." Warner-Lambert, 86 F.3d at 6.

**2. Moody's Fails to State a Claim for Trademark Dilution**

Moody's plausibly alleges that the "Moody's" mark is famous because of the mark's longstanding use, distinctiveness, and high degree of consumer recognition, (Compl. ¶ 54), and Stamdata does not contest this. The Complaint also pleads facts sufficient to support a finding of Stamdata's use of the "Moody's" mark in

commerce (i.e., Stamdata's use of "Moody" to identify ratings in its services). Stamdata's use of the "Moody's" mark after the mark was famous is also easily established—Moody's has used the relevant "Moody's" marks for decades. (See Compl. ¶ 45.) The survival of Moody's trademark dilution claim thus turns on whether the Complaint contains plausible allegations of quality control tarnishment.[13]

Moody's fails to allege plausibly the first two required elements for quality control tarnishment. The Complaint contains no facts concerning whether Moody's "has established legitimate, substantial, and nonpretextual quality control procedures," Warner-Lambert, 86 F.3d at 6, let alone that Moody's in fact follows them. Accordingly, Moody's theory—that "[t]echnical errors and anomalies . . . are likely introduced by collecting and compiling Moody's-generated data without Moody's authorization"—cannot currently stand because Moody's fails to establish a quality control baseline. Moody's trademark dilution claim therefore fails.[14]

---

[13] While blurring may also satisfy the fourth element of trademark dilution, the Complaint's only allegation of blurring is purely conclusory: "Use in commerce by Stamdata of 'Moody's' or a confusingly similar term like 'Moody' in connection with financial ratings is likely to create an association between Stamdata and the MOODY'S trademark that will impair the distinctiveness of the MOODY'S trademark." (Compl. at 11-12.) The Court therefore analyzes Moody's dilution claim as a dilution-by-tarnishment claim.

[14] The Court does not reach Stamdata's further argument that 15 U.S.C. § 1125(c)(3)(A) excludes nominative fair use from dilution liability altogether, (Supp. Mem. at 30 n.16), but Moody's should be prepared to address it in any amended pleading.

### F. Tortious Interference with Prospective Business Relations

Moody's claim for tortious interference with prospective business relations fails because Moody's does not allege that Stamdata had knowledge of the prospective business relationship with which Stamdata allegedly interfered.

To state a claim for tortious interference, a plaintiff must plausibly allege: "(1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." Carvel v. Noonan, 350 F.3d 6, 17 (2d Cir. 2003) ("Carvel I"). For prospective interference (where the relationship is not yet contractual), "as a general rule, the defendant's conduct must amount to a crime or an independent tort." Carvel v. Noonan, 3 N.Y.3d 182, 190 (2004) ("Carvel II").

Moody's alleges that at least one potential customer declined a license from Moody's because it was already receiving Moody's data from Stamdata. (Compl. ¶¶ 65-66.) However, Moody's never alleges that Stamdata knew of this potential customer's relationship with Moody's and intentionally interfered with it, soundly failing on the second element. Moody's accordingly fails

to state a claim for tortious interference with prospective business relations.

### G. Unjust Enrichment

Moody's unjust enrichment claim is partially preempted but does not fail entirely. To state a claim for unjust enrichment under New York law, a plaintiff must allege plausibly that: "(1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc., 373 F.3d 296, 306 (2d Cir. 2004). Unjust enrichment claims founded on the substance of a copyright claim are preempted by the Copyright Act. See id. at 306-07. However, the Lanham Act does not preempt a corresponding unjust enrichment claim. See Transcience Corp. v. Big Time Toys, LLC, 50 F. Supp. 3d 441, 454 (S.D.N.Y. 2014) ("Despite the conclusion reached in Briarpatch, the Copyright Act does not fully preempt state law claims where the claims also seek to protect trademark rights.").

Much of Moody's unjust enrichment claim arises from Stamdata's publication of Moody's ratings without a license, a claim that sounds wholly in copyright infringement. (See Compl. ¶¶ 73-75 (alleging that "Moody's ratings and related intellectual property were created . . . through the investment of substantial time, resources, and creativity" and arguing that "[b]y selling

Moody's intellectual property . . . without paying a license fee to Moody's, Stamdata has been unjustly enriched").) Moody's unjust enrichment claim is therefore preempted to the extent it is predicated on Stamdata's unlicensed use of Moody's ratings, whether the ratings are ultimately copyrightable expression or uncopyrightable facts. See Briarpatch, 373 F.3d at 306 ("To the extent that the project includes non-copyrightable material, such as ideas, these are not sufficient to remove it from the broad ambit of the [Copyright Act's] subject matter categories.").

However, Moody's unjust enrichment claim[15] broadly alleges that Stamdata was enriched by improperly using "Moody's intellectual property"—presumably including the "Moody's" trademark. Because Moody's trademark infringement claim has survived Stamdata's motion to dismiss and the Lanham Act does not preempt state law unjust enrichment claims based on the improper use of a plaintiff's trademark, Moody's unjust enrichment claim survives to the extent it is based on Stamdata's alleged infringement of Moody's trademark. See Transcience Corp., 50 F. Supp. 3d at 454 (discussing cases in which courts dismissed

---

[15] Stamdata separately contends that the unjust enrichment claim is duplicative. Under New York law, unjust enrichment "is not a catchall cause of action to be used when others fail" and is unavailable where it merely duplicates a conventional tort claim. Corsello v. Verizon N.Y., Inc., 18 N.Y.3d 777, 790 (2012). Because the parties have not briefed whether the trademark-based portion of the unjust enrichment claim is duplicative of the surviving Lanham Act claim, the Court does not resolve that question today and invites Stamdata to re-raise the argument in any motion to dismiss Moody's amended complaint.

copyright-based unjust enrichment claims while allowing a related trademark-based claim to proceed).

Accordingly, Moody's unjust enrichment claim is preempted to the extent it is based on any alleged copyright infringement but survives with respect to alleged trademark infringement.

**V. LEAVE TO AMEND**

"[I]t is within the sound discretion of the district court to grant or deny leave to amend." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 200 (2d Cir. 2007). Courts "should freely give leave [to amend] when justice so requires." FED. R. CIV. P. 15(a)(2). "Ordinarily a plaintiff should be granted leave to amend at least once after having the benefit of a court's reasoning in dismissing the complaint." Obra Pia Ltd. v. Seagrape Invs. LLC, No. 19-CV-7840, 2021 WL 1978545, at *3 (S.D.N.Y. May 18, 2021). When a party requests leave to amend, a court should grant it absent "any apparent or declared reason" to the contrary. Foman v. Davis, 371 U.S. 178, 182 (1962).

Moody's has sought leave to amend. (See Opp. Mem. at 12 n.2, 30 n.16, 34 n.18, 38 n.22.) While the Court is skeptical that Moody's will be able to address some of the deficiencies discussed above, the Court will allow Moody's one chance to amend the Complaint and correct any failures it can. Moody's unjust enrichment claim, insofar as it rests on alleged copyright infringement, is, however, dismissed with prejudice because no

amendment can cure federal Copyright Act preemption of state unjust enrichment claims.

## VI. CONCLUSION

For the reasons above, Stamdata's Motion to Dismiss for lack of personal jurisdiction and forum non conveniens is DENIED, and Stamdata's Motion to Dismiss for failure to state a claim is GRANTED IN PART and DENIED IN PART. For the sake of clarity, the Court summarizes the status of each claim below:

- Stamdata's motion is GRANTED as to Moody's claims for (1) copyright infringement, (2) breach of contract, (3) unfair competition, (4) trademark dilution, and (5) tortious interference with prospective business relations, all of which are DISMISSED WITHOUT PREJUDICE.
- Stamdata's motion is DENIED as to Moody's claim for trademark infringement and as to Moody's unjust enrichment claim to the extent it is predicated on Stamdata's alleged infringement of Moody's trademark.
- Stamdata's motion is GRANTED as to Moody's unjust enrichment claim to the extent it is based on alleged copyright infringement, and that portion of the claim is DISMISSED WITH PREJUDICE.
- Moody's shall file an amended complaint within twenty-one (21) days of the date of this Opinion and Order.

The Clerk of Court shall close Dkt. 23.

**SO ORDERED.**

Dated: September 30, 2026
New York, New York

LORETTA A. PRESKA
Senior United States District Judge